IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

REBEKAH BURROUGHS, individually )
and as Administratrix of the ESTATE )
OF TODD BRENT BURROUGHS, )
D.B., individually by her *Guardian Ad Litem*, )
Donald R. Vaughn, and C.B., individually )
by his *Guardian Ad Litem*, Morgan Davis, )
)
        Plaintiffs, )
)
    v. )          1:17CV463
)
SAMUEL S. PAGE, in his official capacity )
as Sheriff of Rockingham County, FRANK )
L. MARTIN and CHASE M. MYERS, )
each in his individual and official capacities, )
and LIBERTY MUTUAL INSURANCE )
COMPANY, as surety, )
)
        Defendants. )


## MEMORANDUM OPINION AND ORDER

Loretta C. Biggs, District Judge.

    This case arises out of the death of Todd Brent Burroughs. His widow and children allege violations of the Fourth and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, as well as various state-law claims.[1] (ECF No. 15 ¶¶ 48–76.) Before the Court is Defendants' Motion for Summary Judgment on all claims.[2] (ECF No. 42.)

---

[1] Ms. Burroughs brings her claims individually and as administratrix of Mr. Burroughs's estate. Mr. Burroughs's children bring their claims via their respective guardians ad litem.

[2] Plaintiffs have also filed two motions to seal certain documents in connection to the instant motion, (ECF Nos. 48, 60), which will be addressed by separate order.

The parties present deeply conflicting accounts of the events leading up to and immediately surrounding Mr. Burroughs's demise. Mindful of this Court's responsibility at this stage to view the facts in the light most-favorable to the non-moving party, and for the reasons stated below, Defendants' motion will be granted in part and denied in part.

## I.   BACKGROUND

On May 28, 2016, Mr. Burroughs, his wife ("Ms. Burroughs"), and two of his minor children ("C.B." and "D.B.") attended the wedding of longtime friends. (ECF Nos. 61-1 at 3–4; 15 ¶ 10.) The ceremony and reception took place just a short drive from the Burroughs' home in rural Rockingham County, North Carolina. (ECF No. 61-1 at 5.) Mr. Burroughs served as a groomsman. (*Id.* at 3.)

The reception ran late into the evening; by the time the family got into their truck to head home, it was after midnight. (*Id.* at 7.) Mr. Burroughs drove, Ms. Burroughs rode in the passenger seat, and the children rode in the back seat behind them. (*Id.*) En route to their home, the Burroughs used a semi-cleared area—a "cut-through"—as a shortcut between the highway and a local road. (*Id.* at 8.) As their truck emerged from the cut-through, it was spotted by Corporal Frank L. Martin ("Martin") and Deputy Chase M. Myers ("Myers") of the Rockingham County Sheriff's Department (together, "the Officers"). (*Id.* at 10; ECF No. 61-3 at 16–17.) The Officers were out performing routine "keep checks"—nighttime security patrols of local businesses—and the cut-through ran near to one of the properties on the Officers' checklist. (ECF Nos. 61-2 at 9–10; 61-3 at 12, 16–17.) A few seconds after the Officers noticed the Burroughs' truck, it turned out from the cut-through and began to travel

along the road. (ECF No. 43-2 at 18; ECF No. 61-2 at 7.) The Officers followed. (ECF No. 43-2 at 16–17.) What happened next is subject to dispute.

## A. Defendants' Account

The Officers present the following version of events: Shortly after the Burroughs pulled out from the cut-through, the Officers attempted to initiate an investigatory stop. (*See* ECF No. 61-2 at 11.) Given the late hour and the truck's proximity to a keep-check business, the Officers developed "a feeling in [their] stomach[s] that something didn't seem right." (*Id.* at 9–10.) As the Burroughs drove away, Martin instructed Myers, who was driving their patrol car, to "accelerate" and "catch up." (ECF No. 43-2 at 52–53.) After some initial fumbling, the Officers managed to activate their blue lights and siren, which they claim to have kept running throughout the "chase" that followed. (*See id.* at 30, 53.) Martin recalls that the Burroughs were driving erratically: crossing the center line multiple times; failing to stop at a stop sign; neglecting to use a turn signal; and generally traveling at a high rate of speed, sometimes in excess of the speed limit. (*See* ECF No. 43-2 at 49–51.) The Officers continued to follow the truck for approximately two miles until both vehicles reached the Burroughs' driveway. (ECF No. 43-2 at 27–30.)

Mr. Burroughs and the Officers exited their vehicles in front of the Burroughs' home. (*Id.* at 29.) Martin ordered Mr. Burroughs to "get back into the vehicle," but he did not comply. (*Id.*) Instead, Mr. Burroughs "walk[ed] toward the rear of his truck" with a "forced grin on his face" and "reached into the bed of the pickup." (*Id.*) Martin, who, by that time, had drawn his X26 Taser, said "let me see your hands." (*Id.* at 29–30.) When Mr. Burroughs again refused to comply, Martin "deployed the X26 Taser, striking [Mr. Burroughs] in his right

side and towards his back." (*Id.* at 31.) At first, Mr. Burroughs's arm was "trembling" and "jerk[ing]," but he soon "appeared to be no longer under [the taser's] effects." (*Id.* at 32.)

Reaching back into the bed of the truck, Burroughs retrieved two beer cans and threw one of the cans at Martin, "striking [him] in [his] midsection" before opening the other can to drink, turning from Martin, and walking away. (*Id.* at 33–34; ECF No. 61-2 at 17.) Martin then "pulled [his] pepper spray and sprayed [Mr. Burroughs] in the back of his head," hoping that the spray would cause Mr. Burroughs to "submit to [his] directives." (ECF No. 43-2 at 34.) In an apparent attempt to "diminish the effects of . . . the pepper spray," Mr. Burroughs poured the beer he was holding on top of his head until Martin pepper sprayed him again, this time in the face. (*Id.* at 35–36.) To relieve the effects of the second spray, Mr. Burroughs reached into the back door of his truck for a bottle of water. (*Id.* at 36–37.) Martin continued to give orders—"let me see your hands" and "get out of the truck"—while circling around and drawing his firearm. (*Id.* at 36.) Emerging with the bottle of water, Mr. Burroughs turned away from the vehicle and began rinsing his face and neck, leading Martin to deploy his pepper spray for a third time as Mr. Burroughs walked toward his residence. (*Id.* at 39–40.) "[I]n an effort to complete the arrest," Martin again used his taser to "drive-stun" Mr. Burroughs on his left side. (*Id.* at 41.) Mr. Burroughs "react[ed]" by "swat[ting] [Martin's] hand, arm[,] and Taser away from his chest," which resulted in Martin himself becoming "tangled" in the taser's wires and "get[ing] the effects of it." (*Id.*)

Meanwhile, Myers, who had been standing off to the side, noticed the Burroughs' dog. (ECF No. 61-2 at 20.) Leashed to a chain, the dog was "barking, showing its teeth," and acting aggressively. (*Id.*) The dog lunged at Myers, who fired two shots at it, but missed his target

both times. (*Id.*) Hearing the gunshots, Martin dropped his taser as Mr. Burroughs yelled, "Don't shoot my [expletive] dog." (ECF No. 43-2 at 41.) Martin then drew his baton and struck Mr. Burroughs's right arm. (*Id.* at 41–42.) Mr. Burroughs "immediately turned toward [Martin] and rushed toward [him], driving [him] into the side of [the Burroughs'] vehicle." (*Id.* at 43.) Mr. Burroughs then "wrenched" the baton out of Martin's hand, threw it to the ground, and then, almost immediately, picked it back up. (*Id.*) Slowly walking toward Martin, Mr. Burroughs was "shouting and cursing" while Martin told him repeatedly to "drop the baton." (*Id.* at 44.) Mr. Burroughs then "feigned an attack[,] . . . lunging forward quickly with his head and shoulders and his elbows bowing out." (*Id.*) Martin "took about a half a step back" and said, "Drop the baton or I'll drop you." (*Id.* at 45–46.) Mr. Burroughs took another step, and Martin fired two shots "center mass." (*Id.* at 47.) Within a "fraction of a second," Martin saw Mr. Burroughs begin to raise the baton. (*Id.*) Realizing he was "under active attack," Martin shot Mr. Burroughs a third time. (*Id.*) Mr. Burroughs then "began to back up . . . sit . . . [and] go to the ground." (*Id.*)

As Mr. Burroughs fell, Martin "fe[lt] [his] leg shaking" and "realize[d] [he] was being dog-bit." (*Id.*) The dog released Martin's leg, but, "to insure that [the Officers] could render aid safely without having to be worried about being dog-bit," Martin shot the dog. (*Id.*) Mr. Burroughs died shortly thereafter. (ECF No. 61-5 at 13.)

### B. Plaintiffs' Account

Plaintiffs dispute critical portions of Defendants' account. As it relates to the initial "pursuit" of the Burroughs' truck, Ms. Burroughs, C.B., and D.B. have all stated that they neither saw blue lights nor heard a police siren until pulling into their driveway. (ECF Nos.

61-1 at 12; 61-4 at 3; 61-5 at 10–11.) Nor did a neighbor "hear any police sirens or see any blue lights" as the cars went by. (ECF No. 61-1 at 6.) In addition, while the Officers contend that the Burroughs vehicle "failed to stop at [a] duly erected stop sign" during the drive between the cut-through and the Burroughs home, Ms. Burroughs has a "very vivid recollection of . . . stopping." (ECF Nos. 43-2 at 49; 61-1 at 11.)

When the vehicles came to a stop in the Burroughs' driveway, Plaintiffs' evidence shows that Mr. Burroughs, aware of the patrol car for the first time, got out of his vehicle to "see what was going on [and] why [the Officers] were there." (ECF No. 61-1 at 15.) Without identifying themselves, the Officers "jumped out and demanded [that he] get on the ground." (*Id.* at 16–17.) As Mr. Burroughs asked "Whoa, whoa, whoa, what's going on?," Martin pulled his taser and deployed it. (ECF Nos. 61-1 at 15; ECF 61-3 at 32–34.) According to Plaintiffs, throughout the entire encounter, the Officers never stated whether or why Mr. Burroughs was being apprehended. (ECF No. 61-1 at 16–17.)

Plaintiffs further dispute Defendants' characterization of Mr. Burroughs's behavior as threatening. In her deposition testimony, Ms. Burroughs states that she did not see Mr. Burroughs push Martin into the side of the truck, despite her vantage point from inside or nearby the truck itself. (*See id.* at 14.) Moreover, Plaintiffs highlight several parts of the Officers' testimony in which Mr. Burroughs appears to be avoiding, rather than seeking confrontation. (*See e.g.*, ECF No. 61-3 at 38 (testifying that Martin pepper sprayed Mr. Burroughs as he was "walking away"), 45 (stating that Mr. Burroughs "turned toward the house with the bottle of water," away from Martin).)

Finally, Plaintiffs' evidence creates a genuine issue as to whether Mr. Burroughs had Martin's baton in his hand when he was shot and killed. According to her testimony, Ms. Burroughs got out of the truck when she heard Myers fire his weapon at the dog. (ECF No. 61-1 at 18.) From that viewpoint, "able to see both of [Mr. Burroughs's] hands clearly" in the headlights of the patrol car, Ms. Burroughs saw "nothing" in her husband's hands when he was shot. (*Id.* at 19–20.) D.B., who had also gotten out of the truck by the time of the shooting, agrees, and testifies that, moments before Martin fired, Ms. Burroughs actually told the Officers that "[Mr. Burroughs] has nothing in his hands." (ECF No. 61-5 at 12–13.) C.B., too, states that "nothing" was in Mr. Burroughs hands when he was shot: "He threw the baton, and then his hands was up . . . and then that's when they shot him." (ECF No. 61-4 at 4.)

Plaintiffs bring five claims based on this sequence of events: (1) wrongful death; (2) negligent infliction of emotional distress; (3) violations of Mr. Burroughs's Fourth Amendment rights via unreasonable seizure and the use of excessive force; (4) violations of the surviving Plaintiffs' Fourteenth Amendment rights; and (5) action on the Sheriff's bond.[3] (ECF No. 15.) Defendants now move for summary judgment based on qualified immunity as to Plaintiffs' federal claims and on public-official and governmental immunity as to Plaintiffs' state-law claims. (ECF No. 42.)

---

[3] In their brief opposing summary judgment, Plaintiffs discuss multiple state-law causes of action that do not appear in their Second Amended Complaint. (*See* ECF No. 59 at 21–22 (discussing claims for false imprisonment, assault and battery, and intentional infliction of emotional distress).) However, "a party may not use its brief in support of or opposition to summary judgment to amend a complaint." *Hexion Specialty Chems., Inc. v. Oak-Bark Corp.*, No. 7:09-CV-105-D, 2011 WL 4527382, at *7 (E.D.N.C. Sept. 28, 2011). Thus, the Court declines to address these newly asserted claims.

## II.    DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant[s]"—here, the Burroughs family—and to "draw all reasonable inferences in [their] favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015)).  "[T]hat obligation does not give way to a court's doubts about the credibility of a nonmoving party's account." *Id.*  This "usually means adopting . . . the plaintiff's version of the facts," even if it seems unlikely that the plaintiff would prevail at trial. *See id.*; *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

### A.  Fourth Amendment Claims

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.  In considering Fourth Amendment claims, the key inquiry is always the same: whether, in light of the specific circumstances of the case, the government's invasion of a citizen's personal security was reasonable. *See Terry v. Ohio*, 392 U.S. 1, 19 (1968). Because reasonableness is inherently context specific, courts must carefully balance "the nature and quality of the intrusion . . . against the countervailing governmental interests at stake." *Yates v. Terry*, 817 F.3d 877, 884–85 (4th Cir. 2016) (quoting *Jones v. Buchanan* 325 F.3d 520, 527 (4th Cir. 2003)).

A similar balancing is required when, as here, a defendant moves for summary judgment on the basis of qualified immunity: weighing "the need to hold public officials accountable when they exercise power irresponsibly" against "the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To that end, qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Yates*, 817 F.3d at 884 (citations omitted).

In *Saucier v. Katz*, the Supreme Court articulated a two-step procedure for resolving officers' qualified immunity claims.[4] *See* 533 U.S. 194, 201 (2001). First, the Court must determine "whether a constitutional violation occurred." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). At the summary judgment stage, this means asking whether, "viewed in the light most favorable to the plaintiff[,] . . . [the facts] demonstrate a violation of the plaintiff's constitutional rights." *Harris*, 927 F.3d at 270. Second, the Court must examine "whether the right[s] violated [were] clearly established"—that is, "sufficiently clear that every reasonable official would have understood" that his behavior violated the rights at issue. *See Henry*, 652 F.3d at 531; *Yates*, 817 F.3d at 887. A plaintiff must answer both parts of the *Saucier* framework in the affirmative in order to defeat qualified immunity. *See* 533 U.S. at 201.

Plaintiffs contend that the Officers violated Mr. Burroughs's Fourth Amendment rights in two ways. First, Plaintiffs argue that the Officers lacked sufficient legal and factual

---

[4] The Court has discretion to address each prong in the order "that will best facilitate the fair and efficient disposition of each case." *Raub v. Campbell*, 785 F.3d 876, 881 (4th Cir. 2015) (quoting *Pearson*, 555 U.S. at 242).

justification to support conducting a seizure of any kind—be it the reasonable suspicion necessary to support an investigatory traffic stop or the probable cause required for an arrest. (*See* ECF Nos. 15 ¶¶ 61–66; 59 at 9–12.)  Second, Plaintiffs argue that Officer Martin used excessive force in conducting the seizure that led to Mr. Burroughs's death.  (ECF No. 15 ¶ 64.)  The Court will address each in turn.

### 1. *Whether Seizure Was Justified*

A seizure under the Fourth Amendment occurs "whenever a police officer accosts an individual and restrains his freedom to walk away."  *Terry*, 392 U.S. at 16; *see also Scott*, 550 U.S. at 381.  Probable cause is generally needed to justify seizure by arrest.  *See Michigan v. DeFillippo*, 443 U.S. 31, 36–37 (1979).  However, the Fourth Amendment also permits an officer to briefly stop an individual *without* probable cause to arrest, so long as the officer "has reason to believe that crime is afoot."  *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018).  For these lesser intrusions, the degree of support required is still more than a just a hunch; an officer must be able to point to "specific and articulable facts" justifying the investigative stop.  *Terry*, 392 U.S. at 21.

The parties disagree as to whether the Officers had a reasonable and articulatable suspicion to justify an investigatory stop of the Burroughs vehicle when their "pursuit" began. (*See* ECF Nos. 43 at 13–15; 59 at 9–11.)  However, Plaintiffs' own evidence demonstrates that the Burroughs, unaware that they were being followed, were not "seized" in any real sense until they arrived on their property.  (*See* ECF Nos. 61-1 at 12; 61-4 at 3; 61-5 at 11.)  Because no stop or seizure of Mr. Burroughs occurred until both vehicles had reached the Burroughs' driveway, there is no need to evaluate whether the Officers would have been justified in

making an investigatory stop prior to that time. *See generally INS v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)(explaining that a person has been "seized" once they would not feel free to leave the company of the officer)).

The real question, then, is whether the Officers were justified in conducting a seizure by the time they arrived at the Burroughs' home. The Supreme Court has held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). This is true even when state law does not allow for an arrest for the particular traffic violation in question, *Virginia v. Moore*, 553 U.S. 164, 176 (2008), or when the arresting officers are mistaken in their observation that a traffic violation has occurred, *see Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014).

The Officers have testified that the Burroughs family committed several distinct traffic violations during the brief drive from the cut-through to their driveway—crossing the center line; failing to stop at a stop sign; neglecting to use a turn signal; and speeding—any one of which would create sufficient probable cause to support an arrest of the offending driver. (*See* ECF No. 43-2 at 49–51); *see also* N.C. Gen. Stat. §§ 20-141, -146, -154, -158. Through their pleadings and forecast of evidence, Plaintiffs specifically contest just one of these traffic violations—failure to stop at a stop sign—while otherwise insisting, without factual support, that Mr. Burroughs "committed no crime." (*See* ECF Nos. 59 at 2; 61-1 at 11.) Standing alone, this undeveloped assertion of innocence is insufficient to create a genuine issue of fact as to whether Mr. Burroughs crossed the middle line, sped, or failed to use his turn signal. Because it is uncontested that the Officers observed those violations—minor though they

be—this Court concludes that the Officers possessed both reasonable suspicion to stop the Burroughs' truck and probable cause to arrest Mr. Burroughs by the time they entered the driveway. Thus, the Officers' initial decision to seize Mr. Burroughs did not violate his Fourth Amendment rights and summary judgment is appropriate as to that facet of their claim.

## 2. Whether Excessive Force Was Used

The Fourth Amendment's prohibition on unreasonable seizures also includes the right to be free of "seizures effectuated by excessive force." *Henry*, 652 F.3d at 531 (citation omitted). Probable cause often serves as a proxy for "reasonableness." *See Whren v. United States*, 517 U.S. 806, 818 (1996). However, there are times when seizures are conducted in such "an extraordinary manner" that they become objectively unreasonable, despite the presence of probable cause. *See id.* Put another way, the method and means of seizure matter, even when there is good reason to seize. *See Atwater*, 532 U.S. at 354 (citing *Whren*, 517 U.S. at 818).

To determine whether an officer's use of force is excessive, courts apply a "standard of objective reasonableness." *Harris*, 927 F.3d at 272. Under this standard, the officer's subjective motives and intentions are irrelevant. *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). Instead, the Court must ask "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* This exercise, which requires the Court to inhabit the perspective of a reasonable officer at the scene, defies "precise definition or mechanical application." *Id.* (quoting *Beel v. Wolfish*, 441 U.S. 520, 559 (1979). Police officers are often "forced to make split-second judgments" under "tense [and] uncertain" circumstances; a reality this Court readily appreciates. *See Graham v.*

*Connor*, 490 U.S. 386, 396–97 (1989). Yet the Fourth Amendment's protections are meaningless unless, at some point, "the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who [can] evaluate the reasonableness of a particular . . . seizure in light of particular circumstances." *See Terry*, 392 U.S. at 21. The "objective reasonableness" standard, which requires "careful attention to the facts and circumstances of each particular case," strikes the appropriate balance. *See Clem*, 284 F.3d at 550 (citing *Graham*, 490 U.S. at 396).

In considering the objective reasonableness of an officer's actions, the Court is guided by the three factors set out in *Graham v. Connor*: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. Courts must "consider the facts at the moment the challenged force was employed" but take heed to avoid "[a]rtificial divisions in the sequence of events." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015). As the Fourth Circuit has cautioned, it is possible in these cases to "miss the forest for the trees." *See Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). The better approach, then, is to assess reasonableness "in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Plaintiffs contend that "[n]o reasonable officer in Martin's position would have believed deadly force necessary" against Mr. Burroughs. (ECF No. 59 at 14.) The Officers' counter that, at the moment deadly force was deployed, any reasonable officer in Martin or Meyer's position would have feared for his life. (*See* ECF No. 43 at 15–18.) As stated above,

however, this Court must analyze the use of force under the totality of the circumstances while viewing the facts in the light most-favorable to Plaintiffs.

The first *Graham* factor—"the severity of the crime at issue"—cuts in Plaintiffs' favor. "Even in a case in which the plaintiff has committed a crime," the Fourth Circuit has found that "the first *Graham* factor weighs in plaintiff's favor" when the underlying offense is minor. *Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899–900 (4th Cir. 2016) (citing *Jones*, 325 F.3d at 528). Here, the run-of-the-mill traffic violation(s) committed by Mr. Burroughs were exceedingly minor and in no way indicative of heightened danger. *See* N.C. Gen. Stat. §§ 20-141, -146, -154; *Armstrong*, 810 F.3d at 900 (explaining that the severity of the offense at issue is "intended as a proxy" for how dangerous the offender is). Defendants argue that this low-level risk was quickly amplified by Mr. Burroughs's refusal to comply with their instructions. (*See* ECF No. 43 at 15–16.) However, Plaintiffs' forecast of evidence paints a different picture—one in which Mr. Burroughs, surprised to see the Officers in his own driveway, is tased just as he exits his vehicle to ask "what's going on?" (ECF No. 61-1 at 15–17.) That Mr. Burroughs subsequently struggled with the Officers may impact the remaining *Graham* factors. But his alleged resistance does not change the fact that the crime underlying the initial seizure was a minor one. *See Rowland*, 41 F.3d at 171, 174 (emphasizing the minor nature of the offense even though a struggle ensued between the officer and the plaintiff).

The second factor—whether Mr. Burroughs posed "an immediate threat to the safety of the officers or others"—also weighs against a finding of objective reasonableness. Based on the evidence presented, there is a genuine dispute as to whether Mr. Burroughs had a baton in his hand when he was shot by Martin. (*Compare* ECF No. 43-2 at 47 *with* ECF No. 61-1 at

20.)  Martin has testified that he understood that "deadly force was not authorized" prior to Mr. Burroughs approaching him with the baton.[5]  (ECF No. 43-2 at 42.)  However, even if an immediate threat to the Officers' safety arose after that time, the Plaintiffs' facts demonstrate that any threat justifying the use of lethal force had dissipated by the time Mr. Burroughs was shot.  The Fourth Circuit has long held (and recently reaffirmed) that "even where deadly force initially is justified by a significant threat of death or serious physical injury, a police officer may not . . . employ deadly force when the circumstances change so as to eliminate the threat."  *Harris*, 927 F.3d at 281.  The Burroughs family is unanimous in their testimony that Mr. Burroughs was not holding a baton when he was shot.  (ECF Nos. 61-1 at 19–20; 61-4 at 4; 61-5 at 12.)  Moreover, under Plaintiffs' version of the encounter, it would have been clear to any reasonable officer in Martin's position that Mr. Burroughs was unarmed: his raised, empty hands were illuminated by vehicle headlights as Ms. Burroughs, standing nearby, insisted to the Officers that he "ha[d] nothing in his hands."  (*See* ECF Nos. 61-1 at 19–20; 61-5 at 12.)  Thus, accepting Plaintiffs' version of the facts, Mr. Burroughs did not pose an immediate threat to the safety of the Officers that would have justified the use of lethal force at the time he was shot.  Accordingly, the second *Graham* factor weighs in Plaintiffs' favor.

The final factor—whether and how Mr. Burroughs may have resisted arrest—is more complicated.  By either party's account, Mr. Burroughs never willingly submitted to the Officers.  Further, it is clear that Mr. Burroughs, at some point, dispossessed Martin of his baton.  (*See* ECF Nos. 43-2 at 43; 61-4 at 4.)  However, Plaintiffs dispute whether Mr.

_____

[5] This understanding is in accordance with both the Rockingham County Sheriff Department's guidelines and North Carolina law regarding the use of force.  (*See* ECF No. 61-6 at 6–7); N.C. Gen. Stat. § 15A-401(d).

Burroughs "assaulted" Martin, either by throwing a beer can at him or by shoving him into the side of the truck. (ECF No. 61-1 at 14.) This Court is also uncertain, based on the facts presented, whether parts of Mr. Burroughs's resistance can be properly characterized as "active" at all. The Officers' own testimony portrays Mr. Burroughs as trying to cope with the natural effects of having been repeatedly tased and pepper sprayed: rinsing out his eyes; "trembling" and "jerk[ing]"; pulling away the taser prongs; and, when given the chance, walking away. (ECF Nos. 43-2 at 32, 35–36, 39–41; 61-3 at 38, 45.) The Court acknowledges that a reasonable officer may have been surprised (if not alarmed) by Mr. Burroughs's ability to withstand the significant amount of nonlethal force used against him. However, noncompliance and nonviolent physical resistance do not necessarily create a continuing threat to an officer's safety, and "physical resistance" is not always synonymous with a "risk of immediate danger." *Armstrong*, 810 F.3d at 904–05. In sum, based on the facts presented, the impact of the final *Graham* factor on the Court's objective reasonableness analysis is mixed.

Having considered the *Graham* factors in the full context of this case, the Court concludes that Plaintiffs have sufficiently demonstrated that Martin violated Mr. Burroughs's Fourth Amendment right to be free from seizure by excessive force. It is true that a plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." *City & Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015). However, excessive force is clearly established where "the officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack." *Smith*, 781 F.3d at 104. Viewed in the light most favorable to Plaintiffs, the facts show that Martin pursued Mr. Burroughs on to his property, tased him

twice, pepper sprayed him three times, beat him with a baton, and then, when it would have been clear to any reasonable officer that Mr. Burroughs was unarmed, shot him to death in front of his wife and children—all for minor traffic infraction. This force was excessive and objectively unreasonable.

Of course, the Court's conclusion is not a verdict. Under the Officers' version of the facts, the encounter was harrowing, and the force used may have been reasonable. However, it will be up to the jury to decide whether their account, or Plaintiffs', is more credible.

There remains the question of whether Officer Martin is nonetheless entitled to qualified immunity from suit because "the law did not put [him] on notice that his conduct would be clearly unlawful." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 331 (4th Cir. 2009) (quoting *Saucier*, 533 U.S. at 202). To determine whether a reasonable officer would have known that his conduct was unlawful in a given situation, the Court typically "need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose." *See Wilson v. Kittoe*, 337 F.3d 392, 402–03 (4th Cir. 2003). However, when the "unlawfulness" of conduct would be "apparent" to any reasonable person, a right may still be recognized as "clearly established" even when there is no existing precedent directly on point. *Clem*, 284 F.3d at 553 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Defendants devote little attention to this question in their briefing, opting instead to reiterate that the Officers "acted reasonably, given the circumstances presented to them." (*See* ECF No. 43 at 18–19.) Their choice may be due to the clarity of existing precedent concerning what constitutes objectively reasonable behavior under facts like these. *See Clem*, 284 F.3d at

554 ("The lack of more cases with similar facts is due to the clarity, rather than the ambiguity, of the *Garner* rule."). Certainly it was "well established" that Mr. Burroughs had a right to be free from the use of deadly force absent a reasonable belief that he posed a threat of serious physical harm. *See Garner*, 471 U.S. at 11; *Clem*, 284 F.3d at 553. If, as Plaintiffs' facts show, Mr. Burroughs was visibly unarmed and nonthreatening at the moment he was shot, then it would have been clear to a reasonable officer that the use of lethal force against him was unlawful. *See Harris*, 927 F.3d at 281. The same is true for the nonlethal force employed against Mr. Burroughs, whether viewed as the unlawful use of a taser and pepper spray on a resistant, but nonthreatening arrestee, *see Armstrong*, 810 F.3d at 904, or more generally as part of an "unreasonably aggressive tack," *Smith*, 781 F.3d at 104. Accordingly, viewing the facts in the light most favorable to Plaintiffs, Martin violated Mr. Burroughs's clearly established Fourth Amendment right to be free from seizure by excessive force.

In sum, based on the totality of the circumstances and considering the evidence in the light most favorable to Plaintiffs, this Court concludes that Officer Martin is not entitled to summary judgment on Plaintiffs' excessive force claim.

**B. Fourteenth Amendment Claim**

In their fourth cause of action, the "surviving Plaintiffs" allege that the Officers' conduct was "so shocking to the conscience" that it violated their rights under the Fourteenth Amendment's substantive due process clause. (*See* ECF No. 15 ¶¶ 67–70.) Defendants address this claim in a footnote to their supportive brief, (*see* ECF No. 43 at 12 n.5), to which Plaintiffs have entirely failed to respond. (*See* ECF No. 59.) Typically, "a party's failure to address an issue in its opposition brief concedes the issue." *Oliver v. Baity*, 208 F. Supp. 3d

681, 690 (M.D.N.C. 2016) (collecting cases). Further, the Fourth Circuit has declined to "extend[ ] the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally." *See Shaw v. Stroud*, 13 F.3d 791, 805 (4th Cir. 1994); *see also Spry v. West Virginia*, No. 2:16-cv-01785, 2017 WL 440733, at *12 (S.D.W. Va. Feb. 1, 2017) (collecting cases that dismissed "due process claims brought by the surviving family of police shooting victims when the family members fail to allege that they, as opposed to the decedent, were targeted by police action"). Because Plaintiffs have effectively waived their claim—a claim which is not recognized by the Fourth Circuit in the first place—Defendants are entitled to summary judgment as to Plaintiff's Fourteenth Amendment cause of action.

## C. State-Law Claims

In addition to their federal claims, Plaintiffs bring state law claims[6] for wrongful death and negligent infliction of emotional distress.[7] (ECF No. 15 ¶¶ 48–60.) Defendants argue that both claims are barred by governmental, sovereign, or public-official immunity, and that, in any event, Plaintiffs have failed to forecast evidence to establish the required elements of either. (ECF No. 43 at 19–22.)

---

[6] This Court is obligated to apply North Carolina substantive law to Plaintiffs' state law claims of wrongful death and negligent infliction of emotional distress. *See United Mineworkers of Am. v. Gibbs*, 383 U.S. 715, 725–26 (1966) (explaining that a federal court is "bound to apply state law" to pendent state law claims).

[7] Plaintiffs' fifth claim, "Action on the Bond," does not state a standalone cause of action. (ECF No. 15 ¶¶ 71–76.) This claim, instead, seeks to recover damages for the wrongful death and negligent infliction of emotional distress claims under Sheriff Page's bond.

As an initial matter, the Court notes that, as with their Fourteenth Amendment claim, Plaintiffs have failed to make any argument opposing summary judgment on their claim for negligent infliction of emotional distress. (*See* ECF Nos. 59; 62 at 6–7.) Accordingly, the Court considers the issue conceded and will grant summary judgment to Defendants on the negligent infliction of emotional distress claim. *See Oliver*, 208 F. Supp. at 690.

The claim for wrongful death requires further analysis.[8] Under North Carolina's wrongful death statute, a decedent's personal representative may seek damages when his death was caused "by a wrongful act, neglect, or default of another . . . such as would, if the [decedent] had lived, have entitled [him] to an action for damages." N.C. Gen. Stat. § 28A-18-2 (2013); *Raftery v. Wm. C. Vick. Const. Co.*, 230 S.E.2d 405, 407 (N.C. 1976). As described above, Plaintiffs have forecast evidence sufficient to support a wrongful death claim by depicting a course of behavior that would have allowed Mr. Burroughs to "maintain[ ] an action for negligence or some other misconduct if [he] had survived." *See Nelson v. United States*, 541 F. Supp. 816, 818 (M.D.N.C. 1982) (citing *Raftery*, 230 S.E.2d at 405).

Defendants nevertheless argue that the Officers (sued in their individual capacities) and their employer, the Rockingham County Sheriff's Department (through suit against the Officers in their official capacities) are entitled to immunity. (ECF No. 43 at 19–22.) In North Carolina, public officials "engaged in the performance of governmental duties involving the exercise of judgment and discretion" enjoy immunity from personal liability.[9] *Meyer v. Walls*,

---

[8] Plaintiffs bring their wrongful death claim against Martin and Myers in both their official and individual capacities. (ECF No. 15 ¶ 53.)

[9] Sheriffs and their deputies are considered "public officers" for the purposes of public-official immunity. *See Messick v. Catawba Cty.*, 431 S.E.2d 489, 496 (N.C. Ct. App. 1993).

489 S.E.2d 880, 888 (N.C. 1997) (quoting *Smith v. Hefner*, 68 S.E.2d 783, 787 (N.C. 1952)); *see Thomas v. Sellers*, 542 S.E.2d 283, 286 (N.C. Ct. App. 2001). However, public-official immunity may be pierced if it is proven that an officer's conduct was "corrupt or malicious" or "outside of and beyond the scope of his duties." *Meyer*, 489 S.E.2d at 888. "An officer acts with malice when he 'does that which [an officer] of reasonable intelligence would know to be contrary to his duty,' *i.e.*, when he violates a clearly established right." *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013) (quoting *Bailey v. Kennedy*, 349 F.3d 731, 742 (4th Cir. 2003)); *see Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984).

Plaintiffs have shown that Martin violated "a clearly established right" through his use of excessive force against Mr. Burroughs. However, no corresponding showing has been made as to Myers's conduct. Plaintiffs maintain that Myers acted contrary to his duty by "actively participat[ing] in the force events leading to [Mr. Burroughs's] death." (*See* ECF No. 59 at 20.) However, as Defendants rightly point out, Plaintiffs do not allege that Myers "used a Taser or baton" or "fired any shots from his service weapon" at Mr. Burroughs; nor do they proffer any facts to support the same. (ECF No. 43 at 11.) Accordingly, the Court concludes that Myers is entitled to public-official immunity on Plaintiffs' wrongful death claim against him in his individual capacity, whereas Martin is not.

Plaintiffs' wrongful death claim also targets the Officers in their official capacities. "[A] suit against a defendant in his official capacity means that the plaintiff seeks recovery from the entity of which the public servant defendant is an agent." *Meyer*, 489 S.E.2d at 887. As a general rule, counties are entitled to immunity from suits for damages based on the performance of a "governmental function, such as providing police services." *Parker v. Hyatt*,

675 S.E.2d 109, 111 (N.C. Ct. App. 2009). "That immunity is absolute unless the [county] has consented to being sued or otherwise waived its right to immunity." *Schlossberg v. Goins*, 540 S.E.2d 49, 52 (N.C. Ct. App. 2000) (citing N.C. Gen. Stat. § 160A-485(a)).

While a county may waive governmental immunity by purchasing liability insurance, immunity is not waived "if the action brought against [the county] is excluded from coverage under [its] insurance policy." *Patrick v. Wake Cty. Dep't of Human Servs.*, 655 S.E.2d 920, 923 (N.C. Ct. App. 2008) (citing N.C. Gen. Stat. § 153A-435). In May 2016, Rockingham County had an insurance policy through The Travelers Indemnity Company. (ECF No. 43-4 at 3.) However, that insurance policy states that it "is not a waiver . . . of any governmental immunity that would be available . . . had [the County] not purchased this policy." (*Id.* at 5.) Further, the policy applies to tort liability "only to the extent that such tort liability is not subject to any defense of governmental immunity under North Carolina law." (*Id.*) Because Rockingham County's insurance policy at the time of this incident expressly excluded torts which could be subject to governmental immunity, the county had not waived its governmental immunity by purchasing insurance. *See Patrick*, 655 S.E.2d at 924.

However, there is another route to waiver. All sheriffs in North Carolina are statutorily required to furnish bonds to cover liabilities for wrongs committed under the color of their office, and any person who is "injured by the neglect, misconduct, or misbehavior in office of any . . . sheriff [or his deputies], may institute a suit or suits against said officer or any of them and their sureties upon their respective bonds." *See* N.C. Gen. Stat. §§ 162-8 and 58-76-5; *Messick*, 431 S.E.2d at 496. In effect, this statutory scheme operates as a waiver, working "to

remove the sheriff from the protective embrace of governmental immunity," so long as "the surety is joined as a party to the action." *Messick*, 431 S.E.2d at 494.

Here, Plaintiffs have shown "neglect, misconduct, or misbehavior" by Officer Martin; Sheriff Page does not dispute that he has obtained and maintained a surety bond as required by statute; and the surety on said bond, Liberty Mutual Insurance Company, has been properly included as a defendant. Under these circumstances, the bond operates as a waiver of governmental immunity, *see id.*, making a suit against Martin in his official capacity, as well as the inclusion of Sheriff Page and Liberty Mutual as defendants, appropriate.[10] *See State ex rel. Cain v. Corbett*, 69 S.E.2d 20, 24 (N.C. 1952) (explaining that, where a deputy sheriff acts in his official capacity, the sheriff and the surety on his bond are proper and necessary parties).

## III. CONCLUSION

To summarize, the Court concludes that: (1) while the Officers' initial decision to seize Mr. Burroughs was lawful, Martin's use of force was excessive and objectively unreasonable, in violation of clearly established Fourth Amendment rights; (2) by failing to address Defendants' arguments regarding their Fourteenth Amendment and negligent infliction of emotional distress claims, Plaintiffs have conceded these issues; and (3) Plaintiffs have forecast sufficient evidence to go forward with their wrongful death claim, but only against Martin

---

[10] In their response brief, Plaintiffs argue that Sheriff Page is also liable, pursuant to 42 U.S.C. § 1983, for "unconstitutional practices," "failures to train," and enabling a "'custom' of condoning unconstitutional behaviors." (*See* ECF No. 59 at 8, 16–18 (relying on the theory of liability articulated in *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978), and its progeny).) However, the § 1983 claims set out in the Second Amended Complaint are specifically alleged against Martin and Myers only, and in their individual capacities. (ECF No. 15 ¶¶ 63–64, 68.) Nor are there any allegations in the Second Amended Complaint alluding to a pattern, practice, or custom supported by Sheriff Page or the Rockingham County Sheriff's Department generally. Because a response to a motion for summary judgment is not the proper vehicle to raise new claims, the Court will disregard Plaintiffs' *Monell* claims against Sheriff Page. *See supra*, note 3.

individually and, by virtue of the sheriff's bond and the official capacity suit against Martin, Sheriff Page and surety insurer Liberty Mutual.

For the reasons stated herein, the Court enters the following:

**ORDER**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment, (ECF No. 42), is GRANTED IN PART AND DENIED IN PART. The Motion is GRANTED as to all claims with respect to Officer Myers; as to Plaintiffs' Fourteenth Amendment and Negligent Infliction of Emotional Distress claims with respect to all other Defendants; and as to Plaintiffs' Fourth Amendment claim with respect to Officer Martin, but only as it pertains to the decision to initiate an arrest. The Motion is expressly DENIED as it pertains to Plaintiffs' Fourth Amendment claim of Officer Martin's use of excessive force; and, further, as to Plaintiff's Wrongful Death claim with respect to Officer Martin, individually, and, by way of the official capacity suit against him and the Sheriff's Bond, Sheriff Page and Liberty Mutual Insurance Company.

This, the 28th day of October 2019.

/s/ Loretta C. Biggs
United States District Judge